**AMERICAN SURETY CO. OF NEW YORK**
***v.* FIRST NAT. BANK IN WEST
UNION, W. VA.**

No. 5191.

Circuit Court of Appeals, Fourth Circuit.

March 9, 1944.

412

Walter Higgins, of New York City (Robert R. Wilson, of Clarksburg, W. Va., and Royal F. Shepard, of New York City, on the brief), for appellant.

Samuel A. Powell, of Harrisville, W.Va., for appellee.

Before PARKER and DOBIE, Circuit Judges, and WYCHE, District Judge.

PARKER, Circuit Judge.

This is an appeal from a judgment for defendant in an action instituted against a bank to recover on account of loss of funds of a bankrupt estate misappropriated by a trustee in bankruptcy. Plaintiff is the surety on the trustee's bond and holds by assignment all rights of the bankrupt estate as against the bank. The bank, which was not a designated depository of bankruptcy funds, allowed the trustee to deposit to his individual account certain checks belonging to the bankrupt estate and withdraw the fund so created by checks given for personal purposes. It also received from him certain other checks, payable to him as trustee, for which it paid him in cash. The case was heard by the judge without a jury; and from adverse findings and judgment, the plaintiff has appealed.

The facts are practically undisputed. The trustee was a young lawyer with an apparently flourishing law business in a small town in rural West Virginia. Since 1934 he had maintained a personal account in defendant bank, which was not designated as a depository of bankruptcy funds. In 1934 he was appointed trustee of the estate of one Eli Nutter, bankrupt, and ordinarily thereafter deposited funds belonging to the estate in a Clarksburg bank which had been designated as a depository. On or about August 27, 1937, however, he received from the Pittsburgh-West Virginia Gas Company six checks totaling the sum of $4,050, representing gas royalties due the estate, all of which were payable to him as "trustee in bankruptcy of Eli Nutter," and all of which he indorsed as trustee in bankruptcy and deposited to his personal credit in his personal account with the defendant bank.

At the time of this deposit, the trustee had no balance whatever to his credit in his account with the bank and had not had such balance for ten days or more. The deposit was not an ordinary one, but was four times as large as any that had theretofore been made in that account and stood out in sharp contrast with the other deposits, which were for very much smaller sums, only two other deposits in the history of the account being for as much as $1,000. On the day following the deposit, he drew a check against it in the sum of $701 in repayment of another fund which he had embezzled, and the remainder of the deposit was gradually checked out by checks drawn against it by the trustee and his wife until on December 6, 1937 the credit balance was entirely exhausted. During this period only one deposit had been made in the account, a deposit of $33.80 on September 10th. The cashier of the bank had served in a bank designated as a bankruptcy depository and was familiar with the limitations applying to the deposit and withdrawal of bankruptcy funds.

During the period that this deposit was being checked out by the trustee, he received checks aggregating the sum of $600, payable to him as trustee in bankruptcy of Nutter, and checks aggregating $193.62, payable to him simply as trustee, for all of which he received cash from the bank. None of these checks was deposited in the bank, however; and there is nothing in the evidence to indicate knowledge on the part of the bank's officers that any misappro-

priation of the proceeds by the trustee was intended.

The judge below was of opinion that there was no liability on the part of the bank either with respect to the checks cashed or those deposited in the personal account of the trustee, on the theory that, under the law as declared by the courts of West Virginia, it was essential to liability on the part of the bank that it should have participated in the misappropriation or with knowledge reaped some benefit therefrom, and that there was no evidence of such participation or benefit. The decision was based upon the decisions of the Supreme Court of Appeals of West Virginia in United States Fidelity & Guaranty Co. v. Home Bank, 77 W.Va. 665, 88 S.E. 109, and United States Fidelity & Guaranty Co. v. Hood, 122 W.Va. 157, 7 S.E.2d 872.

We would be in accord with the conclusions reached by the court below if the only principles here applicable were those controlling in the case of deposit and withdrawal of funds by an ordinary fiduciary, where nothing in the law forbids the deposit of the trust funds in the personal account of the trustee or in the bank in which the deposit is made. See our decision in Bank of Vass v. Arkenburgh, 4 Cir., 55 F.2d 130, and cases there cited. In such case the deposit does not of itself constitute a breach of trust on the part of the trustee of which the bank has notice. In the case of the deposit here involved, however, we think it clear that the deposit itself constituted a breach of trust on the part of the trustee of which the bank had ample notice, and that, upon the receipt of the deposit under such circumstances, the bank became a trustee ex maleficio of the amount so received and liable therefor as a trustee to the estate of the bankrupt. The rule applicable is that stated in A. L. I. Restatement of the Law of Trusts, sec. 324, Comment b, as follows:

"If a trustee commits a breach of trust in depositing trust funds in a bank and the bank when it receives the funds has notice of the breach of trust, the bank is liable for participation in the breach of trust, and is chargeable as a constructive trustee of the funds.

"Thus, if a bank receives on deposit funds which it knows are trust funds and which it knows that the trustee is forbidden by the terms of the trust to deposit in the bank, it is liable for participation in the breach of trust, and is chargeable as a constructive trustee of the funds deposited."

There can be no question, we think, that the trustee in bankruptcy was guilty of a breach of his trust in making a deposit of funds belonging to the estate in his private account in a bank not designated as a depository. By section 61 of the Bankruptcy Act, 11 U.S.C.A. § 101, it is provided that courts of bankruptcy "shall designate, by order, banking institutions as depositories for the money of bankrupt estates." By section 47 of the act, 11 U.S. C.A. § 75, it is made the duty of trustees to "deposit all money received by them in designated depositories" and to "disburse money only by check or draft on such depositories." And General Order No. 29, 11 U.S.C.A. following section 53, prescribed by the Supreme Court pursuant to the provisions of the act, provides that money may not be drawn from a depository except by check countersigned by the judge or referee in bankruptcy or upon order of the judge. It is perfectly clear that the purpose of these provisions was to protect the funds of bankrupt estates, not merely to designate banks in which trustees might deposit funds without incurring personal liability, and that their effect was to forbid the deposit of bankruptcy funds in a bank which is not a designated depository or in an account from which they can be drawn without the countersignature required by the general order.

And it is equally clear, we think, that the bank took the deposit of bankruptcy funds not merely with notice, but with notice so full as to leave no doubt that there was actual knowledge on the part of the bank's officers of the breach of trust of which the trustee was guilty in making the deposit. The checks were payable to the trustee as "trustee in bankruptcy of Eli Nutter" and were so endorsed. The fact that they covered funds belonging to the bankrupt estate was thus not a mere matter of notation on the checks which the bank was without obligation to notice, but was incorporated as a limitation upon the right of the trustee to receive payment, of which the bank was bound to take notice in accepting the checks. The rule is established by the great weight of authority that "where there are words indicating a representative or fiduciary character following the name of a payee, indorser, or indorsee on commercial paper deposited in

414

a bank, the bank is chargeable with notice of the trust character of the instrument." 7 Am.Jur. 373; A.L.I. Restatement of the Law of Trusts sec. 297 o; Note, 61 A.L.R. 1399 et seq. When to the fact that the checks were payable to the trustee in bankruptcy in his capacity as trustee is added the fact that the deposit was four times as great as any other made by the trustee in the entire history of his account, that the account had been exhausted at the time of the deposit, and that the bank was a small one with only four employees in a rural community, it is impossible to escape the conclusion that the bank had knowledge as well as notice that the deposit consisted of bankruptcy funds, which the trustee had no right to deposit except in an authorized depository. This is virtually admitted by the cashier in the following passage occurring in his testimony: "The Court: Mr. Freeman, as I understand your testimony, you testified at first that when these checks came in and you saw them, that you knew that they were bankruptcy funds, represented by the check. A. They indicated that they were bankruptcy funds." The cashier was an experienced banker and knew of the restrictions applicable to the deposit of bankruptcy funds. He testified that he thought that the restrictions would not prevent the acceptance by an unauthorized bank of bankruptcy funds provided they were deposited by the trustee to his personal account. He evidently overlooked the inherent breach of trust involved in such a deposit by the trustee. The safeguards so carefully erected for protecting the deposit and withdrawal of bankruptcy funds would mean little if trustees in bankruptcy were at liberty to disregard them whenever they saw fit to do so, and if banks not authorized as depositories might accept deposits of bankruptcy funds, knowing them to be such, credit them to the personal accounts of the trustees and allow them to be withdrawn by the personal checks of the trustees countersigned by no one.

■ The rule that, where a bank receives a deposit of trust funds which it knows the depositor has no legal right to deposit with it, it becomes a trustee ex maleficio of the funds so received and is liable therefor in that capacity, has been applied in a variety of situations. Tucker v. Newcomb, 4 Cir., 67 F.2d 177; Cook v. Elliott, 4 Cir., 73 F.2d 916; Leonard v. Gage, 4 Cir., 94 F.2d 19, 23; Fidelity & De-

posit Co. v. People's Bank, 8 Cir., 44 F.2d 19; In re Potell, D. C., 53 F.2d 877; 7 Am. Jur. 562; Note, 101 A.L.R. 608 et seq; Note, 37 A.L.R. 124 et seq. In the application of the rule, it is quite generally held that a bank becomes liable for public funds deposited by a public official otherwise than in accordance with the statute governing such deposits. Fiman et al. v. State of South Dakota, 8 Cir., 29 F.2d 776; American Surety Co. v. Jackson, 9 Cir., 24 F.2d 768; Empire State Surety Co. v. Carroll County, 8 Cir., 194 F. 593; Board of Commissioners v. Strawn, 6 Cir., 157 F. 49, 15 L.R.A., N.S., 1100; William R. Compton Co. et al. v. Farmers' Trust Co. of Grant City, et al., 220 Mo.App. 1081, 279 S.W. 746; Fidelity & Deposit Co. v. People's Bank, supra; Seaboard Surety Co. v. State Savings Bank, 307 Mich. 48, 11 N.W.2d 321; Employers' Liability Assur. Corp., etc., v. Hudson River Trust Co., 250 App.Div. 159, 294 N.Y.S. 698; State, etc., v. Citizens' National Bank, 100 Ind.App. 501, 193 N.E. 389. No different principle is applicable, we think, with respect to the deposit of bankruptcy funds. It is true, as argued, that such funds are private and not public funds; but this is a distinction without a difference. The controlling consideration is that, just as in the case of public funds, the law requires deposit in a designated depository, that deposit elsewhere is without legal authority and that a bank receiving the deposit with notice of its trust character must hold it subject to the trust or respond in damages for failure to do so.

■ That a deposit of bankruptcy funds in an unauthorized depository gives rise to a constructive trust, or a trust ex maleficio, has been held in a number of cases. In re Potell, supra; In re Weiss, D. C., 2 F.Supp. 767; In re Ocean City Title & Trust Co.'s Bond, D. C., 6 F.Supp. 311; In re Battani, D. C., 6 F.Supp. 376; Hillsdale Grocery Co. v. Union & People's Nat. Bank, D. C., 6 F.Supp. 773. We have noted the decisions to the contrary in Re Bogena & Williams, 7 Cir., 76 F.2d 950, and Irving Trust Co. v. United States, 6 Cir., 83 F.2d 20; but we do not think that they should control our decision here. They were concerned, not with the liability of the bank to the bankrupt estate, but with the right of the estate to preferential treatment in distribution of assets of banks which had become insolvent, and the effect of the decisions was to place the claims of the bankrupt estates on an equal basis with other deposi-

tors. In so far as these cases may be said to hold that a trust ex maleficio should not be declared because title to the property of the bankrupt is vested in the trustee and a mere debtor-creditor relationship is created on a deposit by one holding such title, we cannot agree with their reasoning. A trustee in bankruptcy is vested with title to property belonging to the bankrupt estate; but he holds it in trust and subject to the provisions of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. One of the terms of the trust, and a term expressly created by the law itself, is that funds belonging to the estate shall be deposited in an authorized depository from which they may be withdrawn only by checks properly countersigned. There is no escaping the conclusion that a deposit in an unauthorized depository is a breach of trust, and that the bank which accepts it with notice of the breach of trust is chargeable as a constructive trustee for the bankrupt estate of the funds so received.

Defendant in denying liability for the deposit relies particularly upon the decision in Rodgers v. Bankers' National Bank, 179 Minn. 197, 229 N.W. 90; but we are not impressed with the soundness of the decision in that case, which distinguishes between enforcing a liability against the bank for accepting an unauthorized deposit and subjecting the funds themselves to a constructive trust. It is clear, we think, that, if the funds received by the bank can be held subject to a constructive trust, the bank itself must be held liable for the funds as a constructive trustee thereof. As said in Glasgow v. Nicholls, 124 Wash. 281, 214 P. 165, 168, 35 A.L.R. 419, quoted with approval in Fidelity & Deposit Co. v. People's Bank, supra [44 F.2d 21]: "A trustee de son tort does not escape liability to his cestui que trust by showing that he has disposed of the property, the subject of the trust. It may be that such disposition has placed the property in the hands of a bona fide purchaser for value, without notice, and the cestui cannot impress the trust upon the property in the hands of the ultimate holder of it; but, at the same time, the trustee de son tort is personally liable for the value of the property of the cestui which he has had in his possession, for he has converted the trust property, and although the cestui may not be able to follow the specific property and impress a trust upon it, he is nevertheless entitled to a judgment against the wrongdoing trustee."

Defendant points to the statement in Rodgers v. Bankers' National Bank, supra [179 Minn. 197, 222 N.W. 96] to the effect that "the provisions of the Bankruptcy Act and the general order mentioned were not meant to regulate the conduct of a bank which is not a designated depository." This is stating the rule too broadly. It is true, of course, that the provisions of the bankruptcy act and of the general orders in bankruptcy do not apply to a bank which is not a designated depository; but this does not mean that such bank may receive with notice funds which are being deposited in violation of law without taking same as a constructive trustee in accordance with the well settled rule which we have discussed. The statute and general order do not apply to the bank, but they do impose a legal duty upon the trustee in bankruptcy not to deposit the funds therein; and the liability of the bank arises when it receives the funds with notice that they are trust funds and that the trustee is making the deposit in breach of the duty imposed upon him by law. A bank which thus knowingly assists a trustee in the violation of his trust, by allowing him to deposit in his personal account and check out with his personal check funds which he has the right to deposit only in a bonded depository and check out only with a check countersigned by the judge or referee, has no ground to complain when it is held to the liability of a constructive trustee of such funds.

We find nothing in the law of West Virginia opposed to the rule which imposes liability as constructive trustee upon a bank which knowingly accepts a deposit that the depositor is forbidden by law to make with it. On the contrary, the general rule seems well settled in West Virginia that one who receives a trust fund with notice that he is not entitled to receive it, is liable to account therefor. Vance v. Kirk's Adm'r, 29 W.Va. 344, 1 S.E. 717; Huffman v. Hayden, 114 W.Va. 660, 173 S.E. 561. The reasoning of the very cases upon which the bank relies supports the conclusion we have reached. Thus, in United States F. & G. Co. v. Home Bank, supra, it is said that a bank of deposit is liable for a misappropriation by a fiduciary if it actually participates therein. The bank has proceeded on the erroneous theory that the only breach of trust on the part of the trustee occurred upon the checking out of the funds and the use of same for personal purposes; but this is a mistak-

en view. The deposit in an unauthorized depository was clearly a breach of trust; and the acceptance of the deposit by the bank not only made this breach of trust possible but also enabled the trustee to evade the legal safeguards which would have made embezzlement of the funds practically impossible. We do not understand that under the law of West Virginia a bank which has thus assisted in a misappropriation of funds can escape liability merely because it did not know that the trustee intended to steal them. If, therefore, we were bound by the West Virginia decisions in determining the liability of the bank, we would entertain no doubt as to its liability for the deposit.

■ In determining the liability of a bank for a deposit of bankruptcy funds made in violation of the terms of the bankruptcy act, however, we do not understand that we are bound by decisions of the local courts; for the question involved is one of federal rather than of local law. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; D'Oench, Duhme & Co. v. Federal D. I. Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956; Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694; Barnes Coal Corp. v. Retail Coal Merchants Ass'n, 4 Cir., 128 F.2d 645; Cannon v. Dixon, 4 Cir., 115 F.2d 913.

Directly in point, we think, is the very recent decision of the Supreme Court in Clearfield Trust Co. v. United States, supra. In that case the question involved was the liability of a bank upon its indorsement of a government check which it had taken upon the forged indorsement of the name of the payee. The defense was that the bank was discharged of liability under local law because of delay of the United States in giving notice of the forgery. In holding the bank liable, the Supreme Court said [318 U.S. 363, 63 S.Ct. 574, 87 L.Ed. 838]:

"We agree with the Circuit Court of Appeals that the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, does not apply to this action. The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. This check was issued for services performed under the Federal Emergency Relief Act of 1935, 49 Stat. 115 * * *. The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of Pennsylvania or of any other state. Cf. Board of Commissioners v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361. The duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same federal sources. Cf. Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694; D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956. In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards."

The control of bankruptcy funds, like the right of the federal government to issue checks, is based upon the Constitution and laws of the United States. The rights and liabilities with respect to the handling of such funds "find their roots in the same federal sources"; and "in [the] absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." If the local law is not to be looked to for the purpose of determining the extent of a bank's liability upon its indorsement of a check issued under federal law, there is no reason why it should be determinative of the bank's liability with respect to a deposit of funds held by a trustee in bankruptcy for administration under that law. In both cases the bank is dealing with a subject matter controlled by federal law; and in both cases there is the same reason why federal and not local law should determine its rights and obligations.

In point, also, is Sola Electric Co. v. Jefferson Electric Co., supra. In that case the question involved was whether petitioner as licensee was estopped to challenge the validity of a patent upon which was based a price fixing agreement attacked as violative of the Sherman Act. In holding that the question of estoppel was to be determined by federal law and not by the decisions of state courts, the Supreme Court said [317 U.S. 173, 63 S.Ct. 173, 87 L.Ed. 165]:

"It is familiar doctrine that the prohibition of a federal statute may not be set at naught, or its benefits denied, by state statutes or state common law rules. In such a case our decision is not controlled by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. There we followed state law because it was the law to be applied in the federal courts. But the doctrine of that case is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law. Royal Indemnity Co. v. United States, 313 U.S. 289, 296, 61 S.Ct. 995, 85 L.Ed. 1361; Prudence Realization Corp. v. Geist, 316 U.S. 89, 95, 62 S.Ct. 978, 982, 86 L.Ed. 1293; Board of Com'rs v. United States, 308 U.S. 343, 349, 350, 60 S.Ct. 285, 84 L.Ed. 313; cf. O'Brien v. Western Union Telegraph Co., 1 Cir., 113 F.2d 539, 541. When a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield. Constitution, Art. VI, cl. 2; Awotin v. Atlas Exchange Bank, 295 U.S. 209, 55 S.Ct. 674, 79 L.Ed. 1393; Deitrick v. Greaney, 309 U.S. 190, 200, 201, 60 S.Ct. 480, 84 L.Ed. 694."

A federal statute here requires the deposit of bankruptcy funds in a designated depository. A deposit elsewhere is violative of the statute; and the consequences flowing from such violation would seem clearly to be "federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted."

Deitrick v. Greaney, supra, was a suit on a note given to conceal a purchase by a national banking association of its own stock and upon an agreement that it should not be enforced against the makers. In holding that the right of the makers to assert this defense was to be determined by federal law and not by the law of the state where the note was given, the Supreme Court said [309 U.S. 190, 60 S.Ct. 485, 84 L.Ed. 694]:

"A point much discussed in brief and argument, upon the assumption that local law will guide our decision, see Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, is whether, by Massachusetts law respondent is precluded from setting up the illegality of the transaction as a defense to his note. But it is the federal statute which condemns as unlawful respondent's acts. The extent and nature of the legal consequences of this condemnation though left by the statute to judicial determination, are nevertheless to be derived from it and the federal policy which it has adopted, see, Board of County Commissioners of Jackson County v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313, * * * and cases cited. We have recently held that the judicial determination of the legal consequences which flow from acts condemned as unlawful by the National Bank Act involves decision of a federal, not a state question, Awotin v. Atlas Exchange National Bank, supra."

On like principles it is clear that a "federal, not a state question" is involved in the determination of the legal consequences which flow from a bank's accepting a deposit of bankruptcy funds made in contravention of the provisions of the bankruptcy act.

■ We reach the conclusion, therefore, that the liability of the bank with respect to the deposit is that of a constructive trustee, or trustee ex maleficio, for the bankrupt estate. As the funds involved in the deposit have not been returned to the estate, the bank is liable therefor to the estate, or to plaintiff as assignee of the rights of the estate. Fidelity & Deposit Co. of Maryland v. People's Bank, supra, 8 Cir., 44 F.2d 19, 20, 21.

■ With respect to liability for the checks cashed by the bank for the trustee in bankruptcy and not deposited in his account, we agree with the judge below that no basis of liability on the part of the bank has been shown. There is nothing in the statutes or the general order with reference to deposit and withdrawal of bankruptcy funds which forbids the collection of checks in cash from the drawee bank or through other banks. The requirement is merely that money received be deposited in a designated depository and be drawn out by checks properly countersigned. Circumstances can readily be imagined where

418

it would be in the interest of the estate that checks payable to the trustee be collected in cash or sent for collection through the nearest available bank, without the delay that might result from sending them for deposit in an authorized depository. Where cash is paid to a trustee in bankruptcy in exchange for a check indorsed by him in that capacity, and where, as here, there is no showing that the one cashing the check is attempting to aid the trustee in misappropriating the funds or knows of any intended misappropriation on his part, there is no basis in law or in reason upon which liability on the part of the bank cashing it can be asserted. Commercial Savings Bank & Trust Co. v. National Surety Co., 6 Cir., 294 F. 261. It is the duty of the trustee to collect checks payable to him; and there is nothing in the law or the general orders in bankruptcy that requires that such checks be deposited in an authorized depository of bankruptcy funds as a prerequisite of collection. It is argued that the bank should have known from the nature of the checks drawn against the trustee's account that he was misappropriating the funds there deposited; but the officials of the bank deny that they knew of the misappropriation or that they paid any attention to the checks drawn by the trustee, assuming that they were properly drawn. We find no evidence of knowledge on the part of the bank of any misapplication of funds by the trustee except such as was involved in the deposit of bankruptcy funds in his private account in a bank which was not an authorized depository; and this is not sufficient, we think, to charge the bank with notice of intended misapplication of the proceeds of checks which he collected in cash.

It follows that the judgment below will be affirmed in so far as it relates to liability for checks for which the bank paid cash and will be reversed in so far as it relates to liability for the checks aggregating $4,050.00 which it received for deposit and credited to the personal account of the trustee. The costs on the appeal will be divided but no costs will be taxed for printing the appendix to the brief of appellant, since appellant, without permission of the Court, has printed as the appendix to its brief the entire record in the case.

We expect counsel to observe the provisions of our Rule 10, to the effect that the record shall not be printed, but that the parties shall state the facts in their briefs, printing as an appendix thereto those parts of the record material to the questions presented that they desire the Court to read. The entire record is before us in the form of typewritten testimony and exhibits; and there is no reason for printing matter relating to questions as to which there is no controversy. To do so adds to the expense of litigation and imposes useless labor on the Court. In the case at bar, for instance, there is no dispute about any of the evidentiary facts and no occasion to print any portion of the testimony except a few passages relating to the knowledge of the bank's officers as to the nature of the deposits made and the withdrawals therefrom. There was no dispute about how the bank account was kept or how the checks were drawn and no occasion for printing either the account or the checks in the appendix. Nevertheless, at a cost of more than $1,000, appellant has printed all of the pleadings, evidence and exhibits, with all of the colloquies between court and counsel and everything else that occurred in the court below. If our rule had been followed, the cost of printing would have been much less, less labor would have been required of the Court and the result to the parties litigant would have been the same.

Since the abolition of the rule requiring narration of the record, something must be done to reduce the cost of printing and to obviate the necessity of the Court's having to read great masses of immaterial matter. We have attempted to solve the problem by the adoption of Rule 10. Under that rule we expect counsel to select from the typewritten record and print in the appendix to their briefs only those material parts of the record which it is considered important for us to read because they throw light on controverted questions presented by the appeal, such parts, for example, as a diligent lawyer would ordinarily quote in a brief before a trial judge reviewing the report of a master. Counsel should not forget that the entire record is before us in typewritten form and that reference can be made to it without printing in the appendix the parts to which reference is made. We will not countenance evasion of the rule by printing the entire record as an appendix to the brief; nor will we countenance wholesale printing of irrelevant matter, even if there is colorable compliance with the rule. Violation of the

rule will be given consideration, as here, in taxation of costs; and, in aggravated cases of violation, briefs and appendices will be stricken or a reprinting of the appendix in accordance with the rule will be ordered.

Affirmed in part, reversed in part and remanded.